**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-CR-447 (CJN)** |
| **MICHAEL STEVEN PERKINS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth below, the government requests that this Court sentence Michael Steven Perkins to 90 months of imprisonment, a sentence at the low end of the sentencing guidelines range calculated by the government, three years of supervised release, $2,000 restitution, a $13,004 fine, and a $510 mandatory assessment.

## I.      INTRODUCTION

The defendant, Michael Steven Perkins, participated in the January 6, 2021 attack on the United States Capitol:   a violent attack that interrupted the certification of the 2020 Electoral College vote, threatened the peaceful transfer of power after the presidential election, injured over 100 police officers, and resulted in over $2.9 million in damages.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-

Perkins traveled with his friends and family members to Washington, D.C. to participate in the "Stop the Steal" rally led by former President Trump.   When that rally concluded, he and other members of his group walked to the Capitol grounds, trespassing over the restricted perimeter that had been established, and made their way to the West Plaza.   Perkins watched at his friends attacked police officers, then joined in himself – helping his fellow rioters attack the police line, using a flagpole to assault officers, and kicking a fallen officer.   After the police line broke, Perkins moved even closer to the Capitol building: he climbed up the inaugural stage, then ascended to the building's Upper West Terrace.   All told, Perkins spent at least three hours in the restricted Capitol grounds on January 6, 2021.

The government recommends that the Court sentence Perkins to 90 months' incarceration, which is the low end of the Guidelines range of 87 to 108 months, and which the government submits is the correct Guidelines calculation.   Such a sentence reflects the gravity of Perkins's conduct, including a serious assault and other attacks on law enforcement officers and the extensive amount of time he spent on Capitol grounds.

## II.    FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the court to the Affidavit in Support of Criminal Complaint and Arrest Warrant filed in this case for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.   *See* ECF No. 1-1 ¶¶ 5-10.

---

case evaluation.

### B.  Perkins's Role in the January 6, 2021 Attack on the Capitol

On the morning of January 6, Perkins and his group attended the "Stop the Steal" rally and listened to speeches by then-President Trump and other speakers.   When the rally concluded, he and other members of the group, including his co-defendants – Jonathan Pollock, Joseph Hutchinson, Joshua Doolin, and Olivia Pollock – as well as "Associate-2," and "Associate-5",[2] approached the Capitol from the southwest.



*Photograph of the group near the Washington Monument, including*
*Olivia Pollock (circled in light blue), Joseph Hutchinson (circled in gray),*
*Jonathan Pollock (circled in green), Joshua Doolin (circled in dark red),*
*Associate-5 (circled in red), Associate-2 (circled in orange),*
*and Michael Perkins (circled in dark blue)*

---

[2]  Because neither individual has been charged in this matter, they will be referred to as "Associate-2" and "Associate-5" in this submission.

This group crossed the restricted perimeter that the U.S. Capitol Police ("USCP") and Secret Service had established around the Capitol building and portions of the Capitol grounds.[3]   The existence of this perimeter was not news to Perkins.   In fact, he had traveled to Washington, D.C. less than a month earlier, on December 12, 2020, in order to attend a protest in support of then-President Trump.   At that time, Perkins photographed the same signs and fencing establishing a perimeter around the Capitol.



*Government Exhibit 737*
*Photograph found on Perkins's cellphone of bike rack barricades and*
*"Area Closed" signs, taken on December 12, 2020*

As the group approached the Capitol on January 6, 2021, Doolin used his cellphone to record the chaos already in progress.   Doolin narrated his observations that "a lot of fences and a lot of barricades" "hasn't done very good so far," that the fences were "all laying on the ground,"

---

[3] This perimeter was established with bike racks and "snow fencing"—a plastic mesh screen—with officers posted periodically around the perimeter.   GX 104; GX 109; GX 1201 at 2.   On several fences, signs were posted instructing people not to enter the area.   GX 108; GX 1201 at 2.

4

and that, as they approached it "sound[ed] like the cops are shooting rubber bullets and macing people."   GX 714.24 at 01:18-01:24, 01:25-01:30, 01:03-01:11.   He added, "we've got as far as the steps.   There's their fences all laying on the ground."   GX 714.24 at 01:18-01:30.

By approximately 1:56 p.m., Perkins and his group were on the south side of the West Plaza, where police had established a line – reinforced by metal bike racks – along a set of steps in an attempt to prevent the mob from advancing further.   There, Perkins witnessed numerous other rioters attack police officers.   Perkins watched as Jonathan Pollock and Associate-2 charged at the line of officers, brandishing flagpoles, and pulled the fencing away from the line.   *See* GX 301 at 53:17-53:55 (1:56:34 p.m.-1:57:12 p.m.), GX 306 at 12:18-12:43 (1:56:49 p.m.-1:57:14 p.m.).   He watched as Jonathan Pollock pulled a police officer down the steps, kneed and punched another officer in the face, and punched and choked a third officer.   GX 301 at 53:55-54:13 (1:57:12 p.m.-1:57:30 p.m.), GX 303 at 28:32-28:51 (1:57:17 p.m.-1:57:38 p.m.).



*Government Exhibit 301 at 54:01 (1:57:18 p.m.)*
*Perkins (circled in dark blue) watches as Jonathan Pollock (circled in green)*
*grapples with police officers.*



*Government Exhibit 303 at 28:41 (1:57:26 p.m.)*
*Perkins (circled in dark blue) looks on as Jonathan Pollock (circled in green)*
*and other rioters assault police.*

As the crowd and officers separated, Perkins extended both of his arms and raised his middle fingers at the line of officers.  *See* GX 302 at 38:15-38:17 (1:57:50 p.m.-1:57:52 p.m.); Mar. 7, 2023 Trial Tr. at 235:11 ("It looks like he's flicking us off.").



*Government Trial Exhibit 302 at 38:16 (1:57:51 p.m.)*
*Perkins (circled in dark blue) gives the finger to the line of police officers.*



*Government Exhibit 302 (zoomed in) at 38:16 (1:57:51 p.m.)*

A few minutes later, at 2:03 p.m., Perkins joined the fray himself and coordinated with his friends in attacking the line of police officers.  As the rioters continued to antagonize police officers, someone in the crowd yelled "Push up!" and Perkins sprang into action.  GX 305 at 1:02:51-1:03:08 (2:03:51 p.m.-2:04:08 p.m.), GX 307 at 59:55-1:00:11 (2:03:51 p.m.-2:04:07 p.m.).   Perkins looked to his left, as though coordinating with someone else, bent down, and then, along with Associate-5, pushed Hutchinson from behind, propelling Hutchinson up the steps and into the line of officers.  GX 307 at 1:00:00-1:00:14 (2:03:57 p.m.-2:04:11 p.m.).   As he approached the top of the steps, Hutchinson squared off into a fighting stance and punched at the faces of the police officers in the line.   GX 305 at 1:03:07-1:03:19 (2:04:07 p.m.-2:04:20 p.m.), GX 307 at 1:00:10-1:00:18 (2:04:07 p.m.-2:04:15 p.m.).



*Government Exhibit 305 at 1:03:10 (2:04:10 p.m.)*
*Perkins (circled in dark blue) and Associate-5 (circled in red) push Hutchinson*
*(circled in gray) up the steps into the line of police officers.*

Jonathan Pollock performed a similar maneuver a few seconds later, propelled forward by Associate-2 and another rioter, and holding a riot shield out in front of him as he slammed into the police line.   GX 405, 406.

In response to these attacks, officers deployed OC-spray towards the rioters, including in Perkins's direction, and descended the steps to retrieve another officer who had been stranded in the crowd.   As the officers moved down the steps, Perkins came up a step or two towards the officers, picked flagpole up from the ground, and threw it at the officers.   GX 307 at 1:00:37 (2:04:34 p.m.)   Perkins then moved to the base of the steps, as Metropolitan Police Department ("MPD") Officer Anil Parker came down the steps to assist an officer who was lying near Perkins's feet.   As Officer Parker did so, Perkins spotted another flagpole on the ground and picked it up. Holding the flagpole with both hands, Perkins thrust the flagpole into Officer Parker's chest.   GX 307 1:00:46-1:00:51 (2:04:43-2:04:48 p.m.), 308 54:20-54:26 (2:04:41-2:04:47 p.m.).

9



*Government Exhibit 307 at 1:00:48 (2:04:45 p.m.)*
*View from Officer Parker's BWC as Perkins strikes his chest with a flagpole*



*Government Exhibit 308 at 54:25 (2:04:46 p.m.)*
*Perkins (circled in dark blue) pushes a flagpole into the chest of*
*MPD Officer Parker (circled in purple)*

Perkins then raised the flagpole up above his head and swung it down, striking towards the heads of Officer Parker and another officer, Officer Tommie Grable, who himself had been pulled into the crowd moments earlier.[4]   GX 308 54:24-54:27 (2:04:44-2:04:47 p.m.).



*Government Exhibit 308 at 54:26 (2:04:46 p.m.)*
*Perkins (circled in dark blue) swings the flagpole down towards the*
*heads of MPD Officers Parker (circled in purple) and Grable (circled in yellow)*

---

[4] Although Officers Parker and Grable, the assault victims, did not report any physical injuries directly related to Perkins's assaults, Perkins's actions aided those rioters who did succeed in injuring officers and destroying property. His violent conduct served to incite and embolden other violent rioters around him and contributed to the violence and destruction that day.

Less than ten minutes later, rioters on the West Plaza began a new round of attacks on the police, and officers once again descended into the crowd to retrieve a stranded officer, who lay on the ground, surrounded by the mob.   Perkins wound up and kicked at the officer, just seconds before another officer pulled him from the crowd.   GX 408, 714.8.



*Government Exhibit 408 at 00:02*
*Perkins (circled in dark blue) kicks at an MPD officer lying on the ground.*

 

*Government Exhibit 714.8 at 00:02*
*The MPD officer (circled in white)*
*lying on the ground*

*Government Exhibit 408 at 00:06*
*The MPD officer (circled in white)*
*is helped up by another officer*

Despite the barriers, despite the chemical spray, despite police officers' placement of their own bodies between the rioters and the Capitol, and having already assaulted multiple officers, Perkins not only remained on the West Plaza, but pressed further.   When the police line collapsed a few minute later, Perkins continued towards the Capitol building, climbing onto the inaugural stage, then to the Upper West Terrace.

13





*Government Exhibit 928*
*Perkins (circled in dark blue) and Jonathan Pollock*
*(circled in green) on the inaugural stage*

*Government Exhibit 714.21 at 00:21*
*Perkins displaying irritated eyes and*
*a bruise on the UWT*

Perkins ultimately remained at the West Terrace for over an hour, celebrating with other members of his group until at least a little before 5:00 p.m., when he descended the Upper West Terrace and the inaugural stage.  *See* GX 714.15, GX 714.20, GX 714.20, GX 714.22, GX 714.28, GX 420 at 03:04.

## III.    THE CHARGES

On July 13, 2022, a federal grand jury returned a superseding indictment charging Perkins with six counts:  Interfering with Law Enforcement During Civil Disorder in violation of 18 U.S.C. § 231(a)(3) (Count One), Assaulting, Resisting, or Impeding Certain Officers Using a

Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Seven); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Twenty-One), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Twenty-Three), Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Twenty-Five), and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Twenty-Seven).   On March 15, 2023, Perkins was convicted on all charges following a bench trial.

## IV.    STATUTORY PENALTIES

Perkins now faces sentencing on the six charges above.

As noted by the Presentence Report issued by the U.S. Probation Office, Perkins faces up to five years' imprisonment for violating 18 U.S.C. § 231(a)(3), 20 years' imprisonment for violating 18 U.S.C. § 111(a)(1) and (b); ten years' imprisonment for violating 18 U.S.C. § 1752(a)(1) and (b)(1)(A); ten years' imprisonment for violating 18 U.S.C. § 1752(a)(2) and (b)(1)(A); ten years' imprisonment for violating 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and six months' imprisonment for violating 40 U.S.C. § 5104(e)(2)(F).   Presentence Investigation Report at ¶¶ 110-115 (Aug. 9, 2023), ECF No. 245 ("PSR").   Perkins faces up to three years' supervised release each for violating 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), and 18 U.S.C. § 1752(a)(4) and (b)(1)(A).   *Id.* at ¶ 121.   Perkins faces fines of up to $250,000 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A),

and 18 U.S.C. § 1752(a)(4) and (b)(1)(A) and up to $5,000 for violating 40 U.S.C. § 5104(e)(2)(F).  *Id.* at ¶¶ 142-143.   Perkins faces a mandatory special assessment of $100 each for violating 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), 18 U.S.C. § 1752(a)(4) and (b)(1)(A), as well as a mandatory fee of $10 for violating 40 U.S.C. § 5104(e)(2)(F).  *Id.* at ¶¶ 144-145.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  U.S. Probation Office and Government's Guideline Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).   The government agrees with the PSR's calculation of the offense level for Count Seven and submits that the offense level for each count should be calculated separately, prior to conducting a grouping analysis, as follows:

Count One (18 U.S.C. § 231(a)(3)) (Civil Disorder)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level[5] | **10** |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact and/or Dangerous Weapon | **+3** |
| U.S.S.G. § 2A2.4(c) | Cross Reference to § 2A2.2 | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | **+6** |
| | **Adjusted Offense Level:** | **24** |

Count Seven (18 U.S.C. § 111(a)(1) and (b)) (Assault on Officers Parker and Grable)

---

[5] There is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, so the "the most analogous guideline" applies. U.S.S.G. §2X5.1. Here, that is § 2A2.4, "Obstructing or Impeding Officers, which, as outlined below, cross-references to § 2A2.2 because the conduct underlying Perkins's Civil Disorder offense included at least one aggravated assault, namely his attacks with the flagpole.  *See* U.S.S.G. §2A2.4(c)(1).

| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | **14** |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim; | **+6** |
| | **Adjusted Offense Level:** | **26** |

Count Twenty-One (18 U.S.C. § 1752(a)(1) and (b)(1)(A)) (Entering and Remaining in a Restricted Building or Grounds)

| U.S.S.G. §2B2.3(a) | Base Offense Level | **4** |
|---|---|---|
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | **+2** |
| U.S.S.G. §2B2.3(c)(1) | Cross Reference to Count One | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |
| | **Adjusted Offense Level:** | **18** |

Count Twenty-Three (18 U.S.C. § 1752(a)(2) and (b)(1)(A)) (Disorderly or Disruptive Conduct in a Restricted Building or Ground)

| U.S.S.G. §2A2.4(a) | Base Offense Level | **10** |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact and/or Dangerous Weapon | **+3** |
| U.S.S.G. §2A2.4(c) | Cross Reference to § 2A2.2 | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |
| | **Adjusted Offense Level:** | **18** |

Count Twenty-Five (18 U.S.C. § 1752(a)(4) and (b)(1)(A)) (Act of Violence in a Restricted Building or Grounds)

| U.S.S.G. §2A2.4(a) | Base Offense Level | **10** |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact and/or Dangerous Weapon | **+3** |
| U.S.S.G. §2A2.4(c) | Cross Reference to § 2A2.2 | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |

---

[6] Perkins's assault on Officers Parker and Grable was an aggravated assault because it involved a dangerous weapon with intent to cause bodily injury and the intent to commit another felony.

**Adjusted Offense Level:**                                        **18**

Count Twenty-Seven (40 U.S.C. § 5104(e)(2)(F)

    Because this offense is a Class B misdemeanor, the Guidelines do not apply to it.   *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

    The government submits that Counts One, Seven, Twenty-One, Twenty-Three, and Twenty-Five form three groups, as follows.  (Count Twenty-Seven is not grouped because the Guidelines do not apply to it.)

    Group One – Counts Seven and Twenty-Five are grouped together because they include the same victims:   MPD Officers Parker and Grable.   U.S.S.G. § 3D1.2(a).   The highest offense level for this group is 26.

    Group Two – Count One is its own group because it involves victims in addition to the victims identified in Count Seven:   the officers in the police line on the West Plaza and the MPD officer whom Perkins kicked.   The offense level for this group is 24.

    Group Three – Counts Twenty-One and Twenty-Three are grouped together because they involve the same victim: Congress.   U.S.S.G. § 3D1.2(a).   The highest offense level for this group is 18.

    The offense level for Group Two is two levels less serious than the offense level for Group One; the offense level for Group Three is eight levels less serious than the offense level for Group One.   Group One and Group Two therefore each count as one unit and Group Three counts as one-half unit pursuant to U.S.S.G. § 3D1.4.   This results in an increase of three offense level, resulting in a Combined Offense Level of 29.

    The U.S. Probation Office calculated the defendant's criminal history as category I, which

is not disputed.   PSR ¶ 73.   A Combined Offense Level of 29, as calculated above, and a Criminal History Category of I result in a Guidelines range of 87-108 months' imprisonment.

### B.  Perkins's Objections to the Guidelines Calculation

On July 26, 2023, Perkins raised a number of objections to the Guidelines calculation in the PSR.   *See* July 26, 2023 Letter to U.S. Probation Officer Robert Walters from Nancy MacEoin ("Perkins PSR Objections"); PSR at 29.   These objections should be overruled.

#### 1.  U.S.S.G. § 2A2.2

Perkins objects to the application of U.S.S.G. § 2A2.2 to his conviction of Count Seven – Assaulting, Resisting, or Impeding Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).   Perkins does not dispute that if his assault was an "aggravated assault" then § 2A2.2 applies.   And while Perkins does not dispute that the flagpole was used as a dangerous weapon, he argues that his assaults were not "aggravated assaults" because he did not intend to cause "serious bodily injury."   Perkins PSR Objections at ¶ 9 (referencing the Draft Presentence Investigation Report ("Draft PSR"), ECF No. 237 at ¶¶ 51-53); PSR at 29.   Perkins is incorrect.

As an initial matter, Perkins misreads the applicable definition.  While an assault that involves "serious bodily injury" would be an aggravated assault, where, as here, a dangerous weapon was used, the attacker need only have had the intent to cause "bodily injury," rather than "serious bodily injury." *See* U.S.S.G. § 2A2.2, comment. n. 1.   "Bodily injury" is "any significant injury; e.g., an injury that is painful and obvious." *See* U.S.S.G. § 1B1.1, comment. n. 1(B).

The evidence shows that Perkins's intent was to cause "painful and obvious" injuries. Perkins struck officers with the flagpole not once but twice.   He shoved the flagpole into Officer

Parker's chest, then raised it over his head and brought it down towards the heads of Officers Parker and Grable.   This Court has already found that Perkins's assault of Officers Parker and Grable involved an "intentional attempt or a threat to inflict injury upon someone else."   Mar. 18, 2023 Trial Tr. 21:1-2.   At the same time, Perkins does not assert that his intention was "merely to frighten" the officers, and offers no alternative motivation for his striking of the officers with a flagpole and certainly not one that is inconsistent with an intent to injure.   *See United States v. Garcia*, 34 F.3d 6, 11 (1st Cir. 1994) (despite defendant's assertion that he "drove at the agent" in an attempt to flee, but intended only to scare the agent not to hit him, the circumstances of the assault "certainly supported the inference that [the defendant] intended to cause serious bodily harm").

In the context of January 6 cases, courts in this district have rejected similar arguments by other defendants who used weapons to assault officers.   For example, in *United States v. Courson*, 21-CR-35 (RC) (D.D.C. 2021), the Court rejected the defendant's argument that § 2A2.2 should not apply to his Guidelines calculation for a conviction under 18 U.S.C. § 111(a)(1) and (b) because, in striking a police officer with a baton, he "did not intend to inflict a 'significant injury'" and struck the officer only once.   *See id.* ECF No. 317 at 3.   *Cf. United States v. Denney*, 22-CR-70 (RDM), Sept. 28, 2022 Sent. Tr. at 29:7-31:22 (applying enhancement for use of a dangerous weapon pursuant to U.S.S.G. § 2A2.2(b)(2)(B) despite defendant's assertion that he intended only to disarm the officer because "someone who is swinging or dropping a large pipe at a police officer with the intention of even trying to knock a weapon out of their hands, that strikes me as something that is intended to commit bodily injury.").

Perkins also overlooks the fact that an assault is also an "aggravated assault" if it was

committed with the intent to commit another felony.   *See* U.S.S.G. § 2A2.2, comment. n. 1. Perkins did not commit his assaults as an end in themselves, but rather with the intent to engage in a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), an offense for which he was also convicted. Here, in addition to the assaults on Officers Parker and Grable, which were in furtherance of the Civil Disorder offense, Perkins engaged in at least two other specific acts to interfere with law enforcement during the course of the breach of the Capitol:   he pushed Hutchinson into the police line and he kicked an officer who was on the ground.

Accordingly, Perkins's assaults were "aggravated assaults" and Section 2A2.2 is the applicable guideline.

### 2.   *U.S.S.G. § 3A1.2(a)(2)*

Perkins objects to the application of U.S.S.G. § 3A1.2(a)(2) to his conviction of Count Seven and argues that he was not motivated by the officers' status in assaulting them.   *See* Perkins PSR Objections at ¶ 10 (referencing Draft PSR ¶ 54); PSR at 29.   This section was properly applied, as it has been to every assault on police officers on January 6.

Perkins does not dispute that the officers he attacked were MPD officers assisting the USCP in securing the Capitol building and grounds and protecting those inside.   Nor does he dispute that the officers were wearing official law enforcement gear and insignia and were obviously law enforcement officers engaged in their official duties.   Perkins's attacks were directed at these officers of the work they were doing – preventing rioters from breaching the building.   His assaults were therefore clearly motivated by the officers' status.   *See United States v. Salim*, 549 F.3d 67, 76 (2d Cir. 2008) (§3A1.2(a) enhancement properly applied where defendant assaulted victim prison guard in order to "obtain a key that [the victim] possessed only

as a result of this status"); *United States v. Sulik*, 929 F.3d 335, 338 (6th Cir. 2019) (§3A1.2(a)

enhancement properly applied where defendant sent threatening emails to Member of Congress;

victim's official status was at least part of the motivation for the threats, even though defendant

claimed he targeted the victim because of his position on immigration); *United States v. Bailey*,

961 F.2d 180, 182 (11th Cir. 1992) enhancement properly applied where defendant robbed the

postmistress "because, as a postal employee, she was in possession of money orders and a money

order validation machine").[7]

      "[F]ederal courts frequently apply the official-victim enhancement when a suspect

threatens arresting officers with a dangerous weapon."   *United States v. Irving*, 431 F. App'x 513,

515 (7th Cir. 2011) (citing cases).   That is what occurred here.   The Courts of Appeals have

frequently affirmed application of the enhancement where the defendant forcefully strikes, or

attempt to strike, a victim's head with his fists, much less with a deadly weapon as Perkins did

here.   *See United States v. Carter*, 830 F.3d 490, 493 (7th Cir. 2016) ("blow to the head sustained

by Officer Lopez created a substantial risk of serious bodily injury."); *United States v. Feeback*,

53 F.4th 1132, 1135 (8th Cir. 2022) (affirming application of §3A1.2(c) where defendant assaulted

---

[7] Alternatively, a 6-point adjustment under §3A1.2(c)(1) applies because when Perkins assaulted
Officers Parker and Grable, he knew or had reasonable cause to believe that they were law
enforcement officers, and did so "in a manner creating a substantial risk of serious bodily injury."
U.S.S.G. §3A1.2(c)(1).   *See* Mar. 15, 2023 Trial Tr. at 23:8-15 ("A flagpole made of [sturdy
plastic] is capable of being used in a way that could cause serious bodily injury if a person swings
the pole, as Perkins did, at another with considerable force.   It is also capable of causing serious
bodily injury if it is swung at another person's face as occurred here.   That is precisely how the
evidence established Perkins used the flagpole, and he could have cause serious bodily injury in
doing so.").   "[N]either the text of nor the commentary to § 3A1.2(c)(1) suggests an intent
requirement;" it "requires only that the defendant's conduct 'creat[e] a substantial risk of serious
bodily injury' to people that he knew or should have known were law enforcement officers."
*United States v. Coleman*, 664 F.3d 1047, 1051 (6th Cir. 2012).

a prison guard by hitting him in the head, punching him, and trying to bite him); *United States v. Alexander*, 712 F.3d 977, 979 (7th Cir. 2013) ("district court did not clearly err by applying the [§3A1.2(c)] adjustment in this case, in which an adult [defendant] threw two punches aimed at a police officer's head."); *see also United States v. Robinson*, 537 F.3d 798, 802-03 (7th Cir. 2008) (affirming application of §3A1.2(c) enhancement where defendant struggled with arresting officers and repeatedly attempted to draw his loaded gun). Application of the enhancement here would be consistent with, if not required by, the principles the courts have developed. *See generally United States v. Olson*, 646 F.3d 569, 572 (8th Cir. 2011) ("We join those circuits that have concluded that the term "assault" in the Official Victim enhancement is a reference to common-law criminal assault."); *United States v. Pruitt*, 999 F.3d 1017, 1022 (6th Cir. 2021) (applying Model Penal Code 211.1(1) definition of "assault"—which includes "attempts to cause or purposely, knowingly or recklessly causes bodily injury to another" and "attempts by physical menace to put another in fear of imminent serious bodily injury"—to assessment of §3A1.2(c) enhancement).

Perkins's objection should therefore be denied.

### 3. Grouping Objections

Perkins also objects to the PSR's Sentencing Guidelines grouping analysis, arguing that all his offenses should be grouped together, rather than in two (or more) groups. *See* Perkins PSR Objections at ¶ 8 (referencing Draft PSR at ¶¶ 47-50, 64-67); PSR at 29. *First*, he claims that Congress – the victim of Counts Twenty-One and Twenty-Three – does not qualify as victim separate from the police officers who are the victims of Counts One and Seven. The application notes to the Guidelines are clear on this point, however: in cases where is "one person directly

and most seriously affected by the offense," that person is "identifiable as the victim."  U.S.S.G. § 3D1.2 n. 2.  The note distinguishes offenses in which "society at large is the victim," for example, drug or immigration offenses.  *Id.*  Here, however, Congress is not a stand-in for a societal interest.  Rather, Counts Twenty-One and Twenty-Three relate to unauthorized entry into a restricted area and the disruption of "the orderly conduct of Government business or official functions."  18 U.S.C. § 1752(a).  The victim is therefore the disrupted entity – here, Congress, as well as the other government agencies whose functions were disrupted on January 6, 2021, including the United States Capitol Police and the United States Secret Service.  In contrast, the victims of Counts Seven, and Twenty-Five are the officers whom Perkins assaulted – Officer Parker and Officer Grable – and the victims of Count One are the officers that Perkins additionally impeded:  the officers in the police line that Perkins attempted to break, and the officer whom he kicked.[8]

Second, Perkins argues that, because Count Seven embodies conduct that is treated as an adjustment to the guideline applicable to Counts Twenty-One and Twenty-Three,[9] all of his counts of conviction must group pursuant to U.S.S.G. § 3D1.2(c).  Perkins bases this argument on the

---

[8] Perkins's citation to *United States v. Riviere*, 924 F.2d 1289 (3d Cir. 1991), is unavailing.  That case involved a defendant who had been convicted of three firearms offenses and an assault.  The defendant contended that the firearms offenses should group because "society" was the same victim for each offense.  *Id.* at 1304.  However, the Third Circuit held that those offenses grouped, not because they had a common victim pursuant to U.S.S.G. § 3D1.2(a) or (b), but because the conduct underlying one count was a specific offense characteristic for another count pursuant to U.S.S.G. § 3D1.2(c).  *Riviere*, 924 F.2d at 1304-06.

[9] Perkins argues that Count Seven embodies conduct that is treated as an adjustment to the guideline applicable to Counts Twenty-One and Twenty-Five.  Perkins PSR Objections at ¶ 10.  However, under the PSR and the government's calculation, Count Seven groups with County Twenty-Five because they have a common victim.  *See* PSR at ¶ 47.  The government assumes this is a typo and that Perkins meant Count Twenty-Three, not Twenty-Five.

application of the official victim enhancement – § 3A1.2 – to the Guidelines calculation for Count Seven.   The government submits that the 6-level enhancement pursuant to § 3A1.2 does not apply to Counts Twenty-One and Twenty-Three, because the victim of those offenses is Congress.   To the extent that Perkins is arguing that a cross-reference resulting in the application of § 2A2.2 mandates that counts group, the application notes are clear on this point as well:   "A cross reference to another offense guideline does not constitute 'a specific offense characteristic . . . or other adjustment' within the meaning of subsection (c)."   U.S.S.G. § 3D1.2(c) n. 5.

Regardless of how the Court resolves these disputed guidelines issues, the government requests that the Court find at sentencing that it would impose the same sentence under the § 3553(a) factors.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Perkins's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Perkins knowingly trespassed over the restricted perimeter around the Capitol grounds.   He helped an associate charge police and thrust and swung a flagpole at officers.   He also kicked an officer who was stranded in the mob.   The nature and circumstances of Perkins's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 90 months imprisonment.

25

### B.  The History and Characteristics of the Defendant

Perkins has one prior conviction as an adult.   In 2007, he pleaded guilty to stealing $3,500 of copper wire from a construction site and was sentenced to 18 months of probation.   PSR ¶ 72. Perkins was also arrested in 2000 and charged with disorderly conduct, though the charges were abandoned.  *Id.* at ¶ 77.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Perkins's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### a.  General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### b.  Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a substantial term of incarceration.

Perkins has demonstrated no remorse for his actions, either after his arrest or at trial.   This counsels in favor of a substantial sentence, regardless of any late expressions of regret Perkins may make now that he faces sentencing.  *See United States v. Matthew Mazzocco*, 1:21-CR-54 (TSK),

---

[10]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See* Sentencing Hearing Transcript at 49, *United States v. Smocks*, 21-cr-198 (D.D.C. Oct. 24, 2021) ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.   "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

### a.  Sentences Following a Conviction at Trial

In *United States v. Gillespie*, 22-CR-60 (BAH), the defendant was among the rioters along Lower West Terrace of the Capitol who pushed, shoved, yelled at, and fought law enforcement officers.   He wormed his way through the crowd, eventually maneuvering through the rioters to the line of police officers defending the Tunnel.   At two points, he grabbed police riot shields,

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here:  https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

using them to ram the police.   Gillespie also grabbed an MPD sergeant by the arm for several

seconds, keeping the sergeant from fending off other attacks, and yanking the sergeant towards the

mob.   While still on Capitol grounds, Gillespie gave an interview in which said, "We were very

close. We were almost overpowering them" and, "Take it over, take it over.   Own it for a few

days.   I'm not an anarchist, but you can't let this stand what happened in this election."   At

trial, Gillespie testified, and said of his time at the Capitol, "It was just fun, exciting, enjoyable. I

mean, we were all -- we were just having a relaxed, nice time."

Following trial, Gillespie was found guilty of four counts, violations 18 U.S.C. § 111(a)(1);

18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(4); 40 U.S.C. § 5104(e)(2)(F).   The Court determined

that Gillespie's total offense level was 26, and his criminal history category was I, resulting in a

Guideline range of 63-78 months.   The Court imposed a 68-month sentence.

Like Gillespie, Perkins attacked police officers, though Perkins did so with a dangerous

weapon.   He also joined in the general civil disorder of that day, though Perkins's conduct was

arguably more serious than Gillespie's, as Perkins kicked a fallen officer.   Both men it seemed

failed to grasp the seriousness of their actions, and as mentioned above, Perkins has not shown any

meaningful remorse for what he did.

In *United States v. Schwartz*, 21-CR-178 (APM), the defendant helped overwhelm the

police line on the Lower West Terrace.   Schwartz threw a chair at the line of officers, creating an

opening in the police line the allowed hundreds of rioters to flood the Terrace as overwhelmed

officers retreated.   He then stole chemical munitions left by fleeing officers to attack them.   He

later made his way up to the inaugural stage and entered the Tunnel, where he worked with

codefendants to again spray the line of officers inside with pepper spray.   Schwartz did all this

while on probation in at least one other case involving both assaultive conduct and illegal firearms possession.   After leaving Capitol grounds, Schwartz bragged to multiple people about his participation in the violence that day, boasting about how he had thrown the "first" chair at officers and how he had stolen police munitions to use against them.

Following a jury trial, Schwartz was found guilty of eleven counts, four violations of 18 U.S.C.§ 111(a)(1) and (b) and § 2; one violation of 18 U.S.C. § 1512(c)(2) and § 2, one violation of 18 U.S.C.§ 231(a)(3); one violation of 18 U.S.C.§ 1752(a)(1) and (b)(1)(A); one violation of 18 U.S.C.§ 1752(a)(2) and (b)(1)(A); one violation of 18 U.S.C.§ 1752(a)(4) and (b)(1)(A); one violation of 40 U.S.C.§ 5104(e)(2)(D), and one violation of 40 U.S.C. § 5104(e)(2)(G).   The prosecution represented that Schwartz's total offense level 34 and his criminal history category was VI, resulting in a Guidelines range of 262-327 months.   The Court ultimately imposed a 170-month sentence.

Both Schwartz and Perkins attacked officers with dangerous weapons, and both showed a lack of remorse for their actions.   While Perkins's conduct was less continuously violent than Schwartz's, as noted above, Perkins showed that his anger at police was not a passing whim but a continuous objective.   What accounts for Schwartz's higher sentence is his extensive criminal history and his conviction of a violation of 18 U.S.C. § 1512(c), which had an offense level of 31. As such, Perkins's sentence need not be so severe, but must capture the seriousness of his actions, which in many ways paralleled Schwartz's.

In *United States v. Webster*, 21-CR-208 (APM), the defendant, a former United States Marine and New York City police officer, wore his bullet-proof vest and carried a metal flagpole to the U.S. Capitol grounds on January 6, 2021. On the West Plaza, Webster than brought the

flagpole down repeatedly on the barricade in front of an MPD officer, causing it to break, then charged the officer, tackled him to the ground, and attempted to rip off his gas mask.   Webster also directly contributed to the collapse of the police line at the West Plaza, enabling thousands of rioters to penetrate the grounds and ultimately break into the building.   At trial, Webster took the stand at trial to villainize and blame the very officer he attacked.

Webster was ultimately found guilty at trial of six counts, violations of 18 U.S.C. § 111(a)(1) and (b); 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A); 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and 40 U.S.C. § 5104(e)(2)(F) -- the very same charges of which Perkins was convicted.   The Court determined that Webster's total offense level was 37[13] and criminal history category was I, resulting in a Guidelines range of 210 to 240 months' imprisonment.[14]   The Court imposed a 120-month sentence.

Webster's and Perkins's behavior paralleled each other.   Both men assaulted officers with flagpoles, both contributed to the collapse of police lines, and both refused to take responsibility for their actions.   Unlike Webster, however, Perkins did not prepare for January 6 by bringing protective gear or weapons; nor did he testify falsely at trial or otherwise obstruct justice.

### b.  Sentences Following a Guilty Plea

In *United States v. Kenyon*, 21-CR-726 (CJN), the defendant breached the U.S. Capitol and spent approximately 30 minutes walking through the building.   He used his fist and a flagpole to

---

[13]  Had Webster not received enhancements for obstruction of justice (U.S.S.G. § 3C1.1), for using body armor in connection with a crime of violence (U.S.S.G. § 3B1.5(2)(B)), and restraint of victim (U.S.S.G. § 3A1.3), his offense level would have been 29, resulting in a Guidelines range of 87-108 months – the same as the range the government calculated for Perkins.

[14]  Webster's range of 210-262 months was capped by the 20-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a) and (b).

damage a large exterior window. Finally, Kenyon joined and participated in assaulting police officers with a large and violent group of rioters at the Capitol's Lower West Terrace Tunnel. There, over approximately 10 minutes, Kenyon pushed and threw several large objects to assault officers attempting to the guard the tunnel area. At one point, Kenyon used a table leg with a protruding nail to strike at officers, striking one in the leg and a second officer on the head such that Kenyon's weapon became lodged in the officer's face shield and helmet.

Kenyon pled guilty to two counts, both violations of 18 U.S.C. §111(a)(1) and (b). The Court determined that Kenyon's total offense level was 28 and his criminal history category was I, resulting in a Guideline range of 78-97 months. This Court imposed a 72-month sentence, in part due to the significant challenges that the defendant had faced in his life to that point.

Over a similar timespan, both Perkins and Kenyon engaged in aggressive acts towards police officers, including assaulting officers with dangerous weapons. While Kenyon, unlike Perkins, entered the Capitol building and destroyed property, he also accepted responsibility by pleading guilty. Perkins proceeded to trial, and thus far has not accepted responsibility.

In *United States v. Beddingfield*, 22-CR-66 (CJN), the defendant used a flagpole to strike police officers on the West Plaza of the Capitol. Beddingfield then broke off a piece of the damaged flagpole and threw it at another officer. He faced the Capitol and made a gesture (commonly associated with the Nazis), extending his arm and hand forward and at an upward angle. Beddingfield entered the Capitol and spent nearly 30 minutes inside, at one point joining a group of rioters who pushed up against and attacked a small group of police officers. When he committed these acts, Beddingfield was subject to conditions of release in Johnston County, North Carolina, while awaiting trial there on a charge of Attempted Murder. On November 17, 2020,

before his attack on the Capitol, Beddingfield wrote to an unidentified Instagram user, "Anyone who is in antifa deserves a slow death.   They are literally communists."   Nearly a year after the events at the Capitol, on January 19, 2022, Beddingfield wrote to an unidentified Instagram user, "I'd like to reclaim America and it is fine if a few of my peoples enemies are 'hurt' in the process."

Beddingfield pled guilty to one count, a violation of 18 U.S.C. § 111(a)(1).   The prosecution calculated that Beddingfield's total offense level was 21 and his criminal history category was I, resulting in a Guideline range of 37-46 months.   This Court imposed a 38-month sentence.

Like Beddingfield, Perkins assaulted multiple officers in a relatively brief period of time. Yet, like Kenyon, Beddingfield ultimately accepted responsibility by pleading guilty; Perkins did not.

In *United States v. Miller*, 21-cr-119 (CJN), the defendant brought with him rope, a grappling hook, a mouth guard, and a bump cap—tools that he referred to as "riot gear"—and said that he "looked forward" to fighting what he called the "soft" law enforcement officers in Washington, D.C.   Miller used social media to threaten public figures, including Senator Charles Schumer, Mark Zuckerberg, and Jack Dorsey.   He was so disruptive on the East Front of the building that he was twice detained, the second time resulting in him being put in handcuffs. Miller instead stayed at the riot, initially filming himself talking about a revolution.   Miller then forced his way past the Capitol Police and entered the Rotunda, making it to the old Senate Chamber before being turned back to the Rotunda.   He also assaulted an MPD sergeant and engaged in a physical altercation with no fewer than six officers.   Finally, in response to

Congresswoman Ocasio-Cortez's social media post to "Impeach," Miller directly responded: "Assassinate AOC."

Miller ultimately pled guilty to nine counts:  three counts of violating 18 U.S.C. § 231(a)(3), and one count each of violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 18 U.S.C. § 1752(a)(3); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(E); 40 U.S.C. § 5104(e)(2)(G); 18 U.S.C. § 111(a)(1); and 18 U.S.C. § 875(c).   The court concluded that Miller's total offense level was 20 and his criminal history category was I.   As such, the appropriate Guidelines range was 33 to 41 months incarceration, one to three years supervised release, and a fine of $15,000 to $150,000.   Statement of Reasons, *United States v. Miller*, 1:21-CR-119 (CJN) (D.D.C. Feb. 27, 2023), ECF No. 148 at 1.   The court ultimately sentenced Miller to 38 months incarceration, 36 months supervised release, and $2,000 restitution.    This was on the high end of the guidelines range, and reflected the seriousness of Miller's actions.

Both Miller and Perkins spent extensive time on the Capitol grounds, and both assaulted officers.   Perkins did so with a dangerous weapon, however, and unlike Miller, never pled, and never took apparent responsibility for his actions.

In *United States v. McGrew*, 21-CR-398 (BAH), the defendant stormed the police line at the West Plaza and worked his way to the front of the crowd until he was face-to-face with officers. McGrew then entered the Capitol through the unguarded Upper West Terrace doorway, repeatedly yelling to other rioters, "Let's Go!"   Within seconds of entering the building, McGrew struck a Metropolitan Police Department with his hand and continued up the stairs. He later struck several more officers and successfully grabbed their batons.   He also screamed at police and locked arms with other rioters, in defiance of officers' commands that rioters leave the building.   After exiting,

McGrew went around the Capitol building and stood at the entrance to the Lower West Terrace Tunnel, where he taunted officers and threw a long pole towards them.  He then engaged in a coordinated effort to push through the line of officers and into the Tunnel, until the officers were able to push the rioters back.

McGrew pled guilty to one count, a violation of 18 U.S.C. § 111(a)(1).  The Court determined that McGrew's total offense level was 21 and his criminal history category was V, resulting in a Guideline range of 70-87 months.   The Court imposed a 78-month sentence.

Unlike McGrew, Perkins didn't enter the Capitol itself.  Like McGrew, however, he attacked several officers at different moments, suggesting that his aggression was not a passing moment but a sustained goal.   And like McGrew, Perkins showed a contempt for law enforcement:  McGrew by refusing to follow their orders, Perkins by flipping them off.  And, while McGrew battled officers with his hands, Perkins assaulted officers with a dangerous weapon.

In *United States v. Ponder*, 21-CR-259 (TSC), the defendant swung a pole at law enforcement officers on the West Plaza of the U.S. Capitol building and the Upper West Terrace of the building, striking two officers' shields and hitting a third officer in the shoulder.   Officers arrested and restrained Ponder; while he was being transported to another area of the Capitol grounds, Ponder encouraged fellow rioters, shouting "Hold the line!" and "Do not give up!"   The officers eventually released Ponder with instructions to leave the Capitol grounds and not return, but Ponder made his way back to the Lower West Terrace, where he was captured on surveillance footage positioned up against the police line, holding a police riot shield.

Ponder pled guilty to one count, a violation of 18 U.S.C. § 111(a) and (b).  The Court determined that Ponder's total offense level was 23 and criminal history category was III, resulting

36

in a Guidelines range of 57-71 months' imprisonment.   The Court imposed a 63-month sentence.

Like Ponder, Perkins assaulted multiple officers with a pole.   Like Ponder, Perkins demonstrated a sustained commitment to violence on January 6, 2021.   But unlike Ponder, Perkins refused to plea, and thus far has refused to take responsibility for his actions.   He thus requires a more substantial sentence than the one Ponder received.

### c.   Sentences for Felony Convictions Not Involving a Violation of 18 U.S.C. §111

In *United States v. Price*, 22-CR-106 (CJN), the defendant was a regional leader of the Proud Boys who not only violently attacked law enforcement officers during the attack on the Capitol, but also organized, encouraged, and directed others to do so.   Price led a group of 4-5 New Jersey Proud Boys to the Lower West Terrace of the Capitol grounds, a restricted area.   He and his group pushed through the crowd of rioters to get to the front line of the mob's conflict with the police.   Price later posted messages on Facebook in which he bragged about his violent conduct against the officers and took credit for breaking through the police line and escalating the riot.

Price ultimately pled to violating 18 U.S.C. § 231.   The prosecution determined that the adjusted offense level for Price's conduct was 11, while his criminal history category was III, resulting in a Guidelines range of 12 to 18 months incarceration.   Government Sentencing Memorandum, *U.S. v. Price*, 1:22-CR-106 (CJN) (D.D.C. Feb. 3, 2023), ECF No. 42 at 1.   This Court ultimately sentenced Price to 12 months and a day, along with 36 months supervised release and $2,000 restitution.

Perkins's conduct was considerably more serious than Price's.   While Price worked to push through a police barrier, Perkins actually assaulted officers himself, and did so with a

37

dangerous weapon.   And unlike Price, Perkins did not ultimately take responsibility for his actions.

In *United States v. Robertson*, 21-CR-34 (CRC), the defendant a police officer, donned a gas mask and approached the Lower West Terrace of the Capitol, where he joined an advancing mob of rioters. Robertson carried a large wooden stick and confronted MPD officers.   He also entered the Capitol building and took a selfie while making an obscene gesture.   After learning he had been criminally charged for his conduct at the Capitol, Robertson his co-defendant's phone and destroyed it and his own phone to hide the evidence of their crimes.

Robertson was found guilty at trial of six counts, a violation 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. § 231(a)(3) and 2, 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), and 40 U.S.C. § 5104(e)(2)(D).   The prosecution calculated that Robertson's total offense level was 29 and his criminal history category I, resulting in a Guidelines range of 87 to 108 months incarceration.   The Court imposed a sentence of 87 months.

Both Perkins and Robertson refused to plead, and apparently failed to take responsibility. But while Perkins did not attempt to destroy evidence as Robertson did, Perkins's conduct was in some ways more serious.   In particular, Perkins directly assaulted officers, and did so with a dangerous weapon.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

38

Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).   *See Fair*, 699 F.3d at 512 (citation omitted).   Here Perkins was convicted of violations of offenses under Title 18, so the VWPA does apply.   In addition, Perkins's convictions on Count Seven, Assault with a Deadly or Dangerous Weapon, Count Twenty-Five, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and Count Twenty-Seven, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) are "crimes of violence," so the MVRA applies to those counts as well.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as

39

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[15]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").   *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019)

---

[15] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

(affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Perkins to pay $2,000 in restitution for his convictions. This amount fairly reflects Perkins role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon base amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Perkins's convictions under 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), 18 U.S.C. § 1752(a)(4) and (b)(1)(A) each subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. §

5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   As the PSR notes, Perkins has benefitted from a campaign on the website GiveSendGo that has raised more than $12,000, and he appears to be capable of paying both restitution and a fine.   PSR at ¶ 109.   To date, Perkins has raised $13,004. *See* Government Exhibit A attached.   Apparently established by Perkins's wife, the site asked for "financial help to cover some bills if [Perkins is] convicted." PSR at ¶ 89.   The funds raised do not appear to have been used to pay for legal fees, and, in any event, Perkins has court-appointed counsel in this matter.   Perkins ought not therefore be allowed to benefit financially from his crimes.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 90 months of imprisonment, three years of supervised release, $2,000 restitution, a $13,004 fine, and a $510 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    /s/ Benet J. Kearney
Benet J. Kearney
Assistant United States Attorney
One Saint Andrew's Plaza
New York, NY 10007
benet.kearney@usdoj.gov
(212) 637-2260

Brendan Ballou
Special Counsel
DC Bar No. 241592
950 Constitution Avenue NW
Washington, DC 20530
(202) 431-8493
Brendan.Ballou-Kelley@usdoj.gov