**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NUMBER 21-CR-447 (CJN)-4** |
| | **:** | |
| | **:** | **FILED UNDER SEAL** |
| **MICHAEL STEVEN PERKINS** | **:** | |

**DEFENSE MEMORANDUM IN AID OF SENTENCING
AND MOTION FOR DOWNWARD VARIANCE**

Michael Steven Perkins, by and through counsel, Nancy MacEoin, Assistant Federal

Defender, submits this memorandum to aid the Court in fashioning a sentence which is

sufficient, but not greater than necessary, to meet the statutory objectives of 18 U.S.C. § 3553(a).

January 6, 2021, will be a day this country never forgets.  And it is a day that will haunt Michael

Perkins for the rest of his life.  Michael came to Washington D.C. with his family and fellow

church members to participate in what he thought would be a peaceful protest, similar to the one

he attended in December 2020.  He travelled with other members of his community, from

███████████, to Washington, D.C.  Michael did not travel with co-defendants Joshua

Doolin, Joseph Hutchinson, Jonathan Pollock, and Olivia Pollock.  They rode in one van, while

Michael rode with his wife, ██████ daughter, and other church members in a different van.

Michael did not bring any weapons, did not wear any military or tactical clothing, or possess any

military equipment.  He was armed only with church pamphlets that Michael and his wife

intended to distribute throughout the day and speak to others about Jesus Christ.

Unfortunately, the events of that day quickly escalated, and he was never able to

distribute those pamphlets.  After being called on by the former president to go to the Capitol,

Michael followed the thousands of other protestors and walked from the Washington Monument

to the Capitol grounds.  When he arrived there, the crowd quickly swelled and escalated into pushing matches.  At 1:56 p.m., Michael became involved in the 16-minute scrum that forever changed his life.  He now stands before this Court humbled, remorseful, and deeply ashamed of his conduct.

This Court is now tasked with the heavy decision of determining what that punishment must be, weighing all the considerations encompassed in 18 U.S.C. § 3553(a), as well as those espoused in *United States v. Booker*, 543 U.S. 220 (2005) and its progeny.  The defense respectfully submits that the appropriate sentence in this case is one that incorporates a significant downward variance from the advisory guideline range considering the arguments presented herein, and upon consideration of evidence and arguments presented during his sentencing hearing on August 17, 2023.

## I.   Michael Perkins' Personal History and Characteristics.

Michael is a true community member.   Attached as Exhibit A are dozens of letters from his neighbors, church members, former coworkers, friends, and family each lending their support to Michael throughout his arrest, trial, and incarceration.  His supporters include veterans, active military personnel, former law enforcement officers, teachers, day care providers, business owners, pastors, and municipal workers.  Michael has known some of these individuals since elementary school.  Others have only known him a few years but speak very highly of his character – an indication of the kind of impression Michael makes on others.  Some letters are from youth in the community who look up to Michael and reflect on the support and leadership he has provided them.  Michael is consistently described by words such as selfless, generous, dependable, honorable, thoughtful, respectful, big-hearted, and as having a gentle soul.

Michael's family has chosen to read their letters to the Court and their video recordings are attached as Exhibit B.

  a.  *Mr. Perkins' Family Background.*

Michael was born and raised in ███████████████████████ ███████████████████████████████. He currently lives on the land where he grew up, sharing the property with his father and stepmother. He has two brothers, both of whom are active members of the Air Force. Michael has been in a relationship with his wife ███████████. They have known each other since they were children in elementary school. They were married in their family church ██████. Michael and ██████ are the proud parents of ████████████████.

Growing up, Michael resided with both parents and his twin brothers. His father supported the family by working as an industrial mechanic. While the family had the basic necessities, they lived very modestly. ██████████, who has known Michael since they were 11 years old, writes about a time when they were shopping for school clothes, and he did not have enough money. He recalls Michael sharing the little he had to make sure his friend had a new t-shirt and shorts for the start of the school year. Michael would buy food for ████ when his own family did not have the money to feed the children. *See* Exhibit A, Letter 2. These are examples of the generosity and commitment to helping others Michael has demonstrated throughout his life.

When he was 14 years old, Michael's parents separated. His high school years were unstable, as he often went back and forth between his parents' homes and frequently found himself without supervision. During these years, he worked installing roofing and at a packing company. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████.

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████    ████████████████████

████████████████████████████████████████████████████

███████████████████████████▌    ████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████.

     Michael graduated high school in 2001 and has consistently worked to support himself and his family.  Though Michael would modestly describe himself as a handyman, he is actually a skilled tradesman who does electrical, roofing, flooring, drywall, painting, framing, automobile mechanics.  He can fix or build nearly anything.  Attached in Exhibit C are photos of projects

---

[1] ██████████████████████████████████████

Michael has built, including and horse barns.  In his own home, he built an entire bedroom, bathroom, deck, pool, and shed.  He learned these skilled trades from his father, through apprenticeships, and by learning on the job.  Michael has taught his children these skills and has done projects alongside his son █████.  Michael uses these skills not only to support his family, but to give back to his community.  In the dozens of support letters, attached as Exhibit A, community members describe the times he did work for others and refused any sort of payment or accepted only a small fee.  The people Michael has worked for describe him as having a good work ethic, being professional, dependable, hard-working, and very detail oriented.

   *b.  Michael Perkins' Devotion to Family and Faith.*

   Michael's life is driven by his commitment to his family and devotion to his faith.  He has been an active and faithful member of █████████████████████ ████████████ since 2015.  He attends multiple services a week and leads a men's prayer group.  Michael is very involved in vacation bible school, where he teaches and mentors children and youth parishioners.  He contributes to the church's missionary work, gathering clothing and other necessities for the work the church does in ██████.  ████████████████ ███████████████████████████████████████████████ ████████████.  He has visited juvenile detention centers in southern Florida to counsel young men who have had contact law enforcement.  Photos of some of Michael's church participation are attached as Exhibit D.

   Michael's devotion to his faith is only rivaled by his devotion to his family.   The loves of his life are his wife ████████, son ████████, and daughter ████████.  He is a hands-on father, spending nearly every weekend taking them fishing and biking.  When the children were young, Michael was the father who showed his son how to work on cars and played Barbies and dress

up with his daughter.  He took them to school, stayed home with them when they were sick, and ensured they had everything they needed, even when money was tight.  Exhibit E are a collection of family photos portraying this tight-knit, faithful family.

Michael has been the family's sole provider for the last eight years so that ██████ could homeschool the children.  They live modestly in a manufactured home, much of which was built by Michael himself.  They have family game nights and bible study and always open their home to neighbors and church members.  Michael is a very loving and involved father and has worked hard to provide his teenage children with the stability and support he did not have at their age. And that support shows in his children.  ██████ is ██ years old, lives at home and prior to his father's incarceration, worked with Michael in his handyman business.  ██████ is ██, works part-time and is about to be a senior in high school.  They both adore their father.

Michael is very remorseful for his actions on January 6, 2021.  The effect of this case on his family especially breaks his heart.  The manner in which he was arrested was terrifying for them.  At 6:00 a.m. on June 30, 2021, the family was awoken by flash bombs and a SWAT team which looked and sounded like a military attack.  The entire family, including his two children, were ordered out of the house at gunpoint.  After his arrest, his daughter was so scared, she slept in her mother's bed while Michael was in jail awaiting pretrial release.  As ordered by this Court, Michael self-surrendered on April 17, 2023.  Since he has been incarcerated, his daughter has had medical issues with her skin, breaking out in hives.  She has seen several doctors who diagnosed her condition as resulting from stress and anxiety.  As ██████ stated in her letter and video to the Court, she is very close to Michael and the prospect that he will be away from the family longer than he already has is devastating to her.

II.   <u>**Factual Objections to the Presentence Report.**</u>

Defense counsel has received the final Presentence Report dated August 9, 2023, and has

the following factual objections.[2]   Ultimately, the facts of this case are determined by the

evidence and testimony introduced at *trial*,  not the government's version of events from pretrial

pleadings.  In its sentencing memorandum, the government asks this Court to sentence Mr.

Perkins based on the facts submitted in the Affidavit in Support of Criminal Complaint and

Arrest Warrant, ECF No. 1-1.  Gov. Sent. Memo., ECF No. 249 at 2.  The Presentence Report

adopted *verbatim* the factual recitation presented in the government's post-conviction

memorandum, which mirrors the exact language of the Affidavit in ECF No. 1-1.  The defense

submits the only relevant facts are those adduced at trial through testimony and exhibits, and

defers to the Court should there be any dispute about those facts.

    a.  *PSR ¶ 13:*

The second-to-last sentence is incorrect.  By the time Michael Perkins arrived at the

Capitol grounds, any physical barriers were already removed.  The bike racks and snow fencing

can be seen in the distance, but they were not "largely intact" at the area when Mr. Perkins

entered the Capitol grounds.  *See* Transcript ("Tr.") 3/7/23, 82-83 (testimony of Captain Sean

Patton regarding a breach of the perimeter starting at 12:55 p.m.  Mr. Perkins and co-defendants

did not reach the perimeter until 1:56 p.m.).

    b.  *PSR ¶ 17:*

The statement that he "repeatedly fought the police" is inaccurate and must be deleted

from the PSR.  Mr. Perkins was convicted of a single count of aggravated assault, as charged in

---

[2] Defense counsel will visit Mr. Perkins on August 16, 2023 to review the Final Presentence Report.
Should any factual inaccuracies become apparent after meeting with Mr. Perkins, defense counsel
reserves the right to raise them during the sentencing hearing on August 17, 2023.

Count 7.  Other actions, such as pushing into Joseph Hutchinson who was pushing into the police

line, tossing a flagpole in the direction of the police line, displaying his middle finger, and

kicking an individual on the ground constituted the conviction to Count 1 (Civil Disorder in

violation of 18 U.S.C. § 231(a)(3)).

      *c.  PSR ¶ 21:*

Mr. Perkins did not push the flagpole into the chest of Officer Parker with both hands.

Video evidence shows that Mr. Perkins did not have both hands on the flagpole.  *See*

Government Exhibits 302 and 307 at 14:04:43.  Video evidence shows Officer Parker rush

towards Mr. Perkins as he leaned over to pick up the flagpole from the ground, running into the

flagpole in the process.  In announcing the verdict, this Court specifically stated that Mr. Perkins

was guilty of Count 7 of swinging the flagpole in a downward motion at Officer Parker and

Officer Grable: "As to the second element, I find beyond a reasonable doubt that Mr. Perkins

assaulted those officers forcibly.  It sort of goes without saying that Mr. Perkins used force when

he swung the flagpole downward at the officers, as indicated by the movement of this arms and

the fact that the officers physically reacted to being struck."  Tr. 3/15/23, 21:24-22:4. (emphasis

added).  "He saw the flagpole on the ground, picked it up and swung it at two officers."  Tr.

3/15/23, 25:16-17.

      *d.  PSR ¶ 22:*

Video evidence showed that Mr. Perkins kicked an individual on the ground, but the

video is not clear as to who Mr. Perkins kicked.  There were multiple people on the ground,

some of whom were not police.  In rendering the verdict, this Court did not conclude that Mr.

Perkins kicked a police officer, but simply an individual.  *See* Tr. 3/15/23 21:20-21 (Mr. Perkins

"later kicked *someone* on the ground."); 25:21 (Mr. Perkins "kicked *someone* on the ground.");
33:15 (Mr. Perkins "kicked *someone* on the ground.")(emphasis added).

    e. *PSR ¶¶ 14, 15, 16, 23, 24, 25:*

  The defense objects to the inclusion of Mr. Doolin's conduct in Mr. Perkins' Presentence
Report.  Mr. Perkins and Mr. Doolin are not charged in any of the same counts of the
superseding indictment.  Additionally, Mr. Perkins was not charged with conspiracy or with
aiding and abetting Mr. Doolin's conduct.  While each defendant was convicted of violating 18
U.S.C. § 231(a)(3), the conduct of which Mr. Perkins was convicted occurred on the lower west
terrace "between at or around 1:56 p.m. and at or around 2:12 p.m."  *See* Count 1 of the
superseding indictment.  The conduct of which Mr. Doolin was convicted of violating 18 U.S.C.
§ 231(a)(3) occurred later in the afternoon in front of the "tunnel" "between at or around 4:18
p.m. and 4:46 p.m."  *See* Count 18 of the superseding indictment.  As such, Mr. Perkins
respectfully requests paragraphs 14, 15, 16, 23, 24, and 25 be stricken from Mr. Perkins'
Presentence Report.  Those paragraphs pertain solely to Mr. Doolin's conduct and relates to
counts on which Mr. Perkins was not charged or convicted.

  **III.** **Objections to the Advisory Guideline Range as Calculated in the Presentence
    Report.**

    a. *The counts of conviction group pursuant to U.S.S.G. § 3D2.1.*

  Because this Court must group closely related counts of conviction, the grouping rules
are not permissive.  As such, Mr. Perkins objects to PSR ¶¶ 47, 48, 49, 50, 64, 65, 66, 116.  This
offense involves a single victim A.P. (named in Count 7) and two or more acts or transactions
connected by a common criminal objective, scheme or plan.  U.S.S.G. § 3D1.2(b).  Unlike the
assault that forms the basis of Counts 1, 7, and 25, the restricted areas offenses that form the
basis of Counts 21 and 25 have no individual victim; the victim in these counts is Congress, *i.e.,*

the government.  But the government does not qualify as a separate victim for the purpose of the grouping rules.  *See e.g., United States v. Riviere*, 924 F.2d 1289, 1305-06 (3d Cir. 1991) (discussing theft of government property as injurious to society at large, not a separate victim). *See also* U.S.S.G. § 3A1.2 cmt. n. 1 (victim enhancement applies "when specified individuals" are victims, but "does not apply when the only victim is an organization, agency, or the government," demonstrating that Congress does not qualify as a separate victim for the purposes of Chapter 3 enhancements).

Additionally, the counts of conviction form a single group under U.S.S.G. § 3D1.2(c), as evidenced by the Government's argument for the official victim enhancement application.  Here, Count 7 embodies conduct that is treated as an adjustment to the guideline applicable to another of the counts, Counts 21 and 25.  U.S.S.G. § 3D1.2(c); see also, application note 5 ("this provision prevents double counting of offense behavior" where the offense conduct covers a single occasion).

Furthermore, it must be noted that this is the position the government has correctly taken in similar cases.  *See e.g., United States v. Fairlamb*, Crim. No. 21-120 (D.D.C.), Gov. Sent. Memo. ECF No. 50 at 28 (government conceded that assaulting officer offense and obstruction of official proceeding offense group under the Guidelines because the former is the basis for enhancing the Guidelines of the latter).

> b. *The Applicable Sentencing Guideline Provision is U.S.S.G. § 2A2.4 – Obstructing or Impeding Officers.*

The defense respectfully objects to the application of U.S.S.G. § 2A2.2 in PSR ¶¶ 51-53, as Obstructing or Impeding Officers (U.S.S.G. § 2A2.4) is the applicable guideline.  Though the flagpole may be a dangerous weapon under U.S.S.G. § 1B1.1, the assault charged at Count 7 is not aggravated because the government cannot establish Mr. Perkins' intention was to cause

serious bodily injury.  *See e.g. United States v. Nunez-Granados*, 546 F.App'x 483 (5th Cir. 2013) (defendant convicted of violating 18 U.S.C. § 111 by kicking Border Patrol agent in the face and causing him serious bodily injury was improperly sentenced under the aggravated assault Guidelines.  The record did not support conclusion that his intention was to cause serious bodily injury, rather, defendant caused injury while trying to escape).   Acting with mere recklessness with respect to the causing of injury is insufficient to support the aggravated assault guideline.

This Court convicted Mr. Perkins of Count 7, a violation of 18 U.S.C. § 111(b), with A.P. (Officer Anil Parker) as the named victim.  There is no evidence that Mr. Perkins targeted Officer Parker with the intent to cause either serious bodily injury or any bodily injury.  First, as argued *supra*, there is no evidence that Mr. Perkins was attending this event with the intention to do anything but peacefully protest.  Second, this conduct occurred in the midst of a melee involving many officers and many protestors.  The scene was chaotic, loud, and disorienting.  Mr. Perkins was pushed around and as he recovered to his feet, he reached down and offered his hand to an officer on the ground, although that officer did not accept his assistance.  This occurred mere seconds before Mr. Perkins leaned to the ground, picked up the flag, stood up, was stricken by Officer Parker who came from behind, and then swung the flagpole at Officers Parker and Grable.  His offer to assist an officer on the ground contradicts any assertion that Mr. Perkins intended to cause serious bodily injury to anyone.  While the Court concluded beyond a reasonable doubt that Mr. Perkins intentionally swung the flagpole at the officers, there is no evidence that he intended to cause serious bodily injury.

Application of § 2A2.4 results in a Base Offense Level of 10.  With the 3-level enhancement under § 2A2.4(b)(1), the adjusted offense level is 13.

c.  *The Enhancement Under U.S.S.C. § 3A1.2(a)(2) Does Not Apply.*

There is no proof that Mr. Perkins was motivated by the police officer victim's status pursuant to U.S.S.C. § 3A1.2(a)(2).  Mere knowledge of an official victim's status is insufficient for the enhancement.  There is no evidence Mr. Perkins engaged in his conduct because he wanted to assault law enforcement officers.  The seconds before 2:04 p.m. were chaotic.  Immediately before he swung at Officers Parker and Gable, he had been knocked to the ground, got back to his feet, reached down to assist a fallen officer, picked up the flagpole, and was immediately struck by Officer Parker in the right temple.

While the Court concluded that Mr. Perkins' actions in swinging the flagpole were intentional, that does not lead to the conclusion that it was motivated by the victim's status as a police officer.  During the trial, the Court inquired whether a defendant needs to be aware that a victim is an officer to be found guilty of 18 U.S.C. § 111.  And both the government and defense counsel agreed that the answer is no, pursuant to *United States v. Fiola*, 420 U.S. 671 (1975).  As such, while Mr. Perkins has been found guilty of assaulting Officers Parker and Grable, that does not equate to him being motivated by their status, especially considering there is no other evidence in the case that Mr. Perkins had animosity towards the officers.  In fact, he tried to assist an officer on the ground immediately prior to this conduct, which belies any such assertion that he was motivated by their status as police officers.

**IV.**  **Application of the 18 U.S.C. § 3553(a) Factors Supports a Downward Variance.**

In sentencing Mr. Perkins, this Court must consider the sentencing factors set forth in 18 U.S.C. Section 3553(a) as the touchstone in determining what sentence to impose.  While the Court must consider the guidelines, they are advisory and only a starting point.  *See United States v. Booker*, 543 U.S. 220, 245 (2005); *Gall v. United States*, 552 U.S. 38, 50 (2007).  With

the decisions of the Supreme Court in *Gall* and *Kimbrough v. United States*, 552 U.S. 85 (2007), sentencing courts have been freed from the rigid, arithmetic framework under the guidelines, and judges have discretion to consider relevant circumstances relating to an offense, and the history and characteristics of a defendant.

In asking this Court to impose a sentence of 90 months, the government cites only one of the 18 U.S.C. § 3553(a) factors:  Mr. Perkins' conduct on January 6, 2023, *i.e.* the nature and circumstances of the offense.  "Such a sentence reflects the gravity of Mr. Perkins's conduct, including a serious assault and other attacks on law enforcement officers and the extensive amount of time he spent on Capitol grounds."  ECF No. 249, p. 2.  Such a request ignores the Court's obligation to consider all statutory objectives under 18 U.S.C. § 3553(a).  Careful consideration of these factors supports a significant downward variance in this case.

     a.   *Nature and Circumstances of the Offense.*

January 6, 2021 was a historical event that Mr. Perkins never saw coming.  He went to Washington, D.C. intending to hand out church pamphlets and peacefully protest, as he had done in December 2022.  Once the group arrived in Washington, several individuals, including Jonathan Pollock, Joseph Hutchinson, and Joshua Doolin, went sightseeing, visiting the Lincoln Memorial.  Michael did not.  He stayed with his wife, daughter, and the older members of the group.  He peacefully attended Trump's speech, and when the larger group decided to follow Trump's message to go to the Capitol, Michael and his family followed, in order to keep the larger group together.  When they arrived at the Capitol, the situation quickly escalated.  Beginning at 1:56 p.m., Michael found himself caught up in the scrum, and committed the offenses for which he was convicted.  In reflecting on that day, Michael is eternally grateful that he did not physically hurt any of the officers involved.

There is absolutely no evidence that Michael went to Washington, D.C. with any intent except to peacefully protest, as he had done before.  He did not plan to hurt anyone or break the law.  He did not bring any weapons or dress in combat attire.  He had no communication with anyone about doing anything except attending the speech and protesting.  His first words upon arrest were that he would never have brought his family, including his ███████ daughter, had he known what would happen.  Unlike many defendants involved in the events of that day, Michael did not rally or recruit others.  In all the hours of footage this Court reviewed in the course of the trial, Michael is never seen chanting, cheering, or inciting others to engage in this behavior.  He did not take any police gear as a "souvenir," and he never boasted or bragged about his conduct on January 6.  Government Exhibit 713.14 is a photo of the police shield Joshua Doolin was convicted of taking.  There are several signatures on the shield of others who came from ███████████ to Capitol.  Michael's signature is not among them, as he has never been anything but ashamed of his actions that day.

The evidence shows that Michael made a spur-of-the-moment decision to participate in this 16-minute scrum, but it does not show that Michael had any intent to specifically injury any police officers.  In fact, moments before he swung the flagpole in a downwards motion towards Officers Parker and Grable, he is seen extending his hand to an officer on the ground to help her up.  The officer rejected his aid, and batted away his hand, likely wary of help from anyone other than another police officer.  This effort to help the officer to her feet is consistent with Michael's true character, as evidenced by the letters of support contained in Exhibit A.  Swinging a flagpole at another person is totally inconsistent with Michael's history, personality, and religious beliefs that he manifests in every other moment of his life to this point.  His conduct in this case was truly aberrational.

    *b.  Personal History and Characteristics of Michal Perkins.*

As demonstrated above, Michael enjoys a reputation in the community for being a devoted husband, father, and community member.  His actions on January 6, 2021 were completely out of character.  He lives a humble, modest life and devotes his time and skills to helping others in need.  His only prior contact with law enforcement was ███████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████.

    *c.  The need for the sentence to reflect  the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.*

Any custodial sentence this Court imposes, even with a substantial downward variance from the advisory guideline range, will reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  Michael Perkins will live with his actions on January 6, 2021 for the rest of his life.  This humble man, who sought nothing in life other than to support his family, be faithful parishioner, and devoted community member, was thrust into the media and associated with one of the most violent days in recent history.

Apart from his actions in those few moments that day, Mr. Perkins has demonstrated nothing but respect for the law.  He would have turned himself in prior to his arrest on June 30, 2023, if given the opportunity.  He knew his family was being followed in the weeks before his arrest.  His wife even called the ██████ Attorney General's Office and reported that a group of people and automobiles were following her and Michael, and asked if it was related to their trip to Washington.  And when they did arrive on June 30, 2023, Mr. Perkins fully complied with law enforcement at the time of his arrest.

Mr. Perkins fully complied with all conditions of release while awaiting trial. For nearly two years, he consistently reported, gave negative drug screens, and obeyed all curfews. In recognition of that, this Court removed the curfew and house arrest conditions of pretrial release. Throughout the pendency of this case, Michael appeared at every single video hearing on time, showing nothing but deference and respect for this Court. He appeared before this Court in punctually throughout the trial, and most importantly, he turned himself in on April 17, 2023, as ordered by this Court.

Though the last several months have not been easy, Michael has already committed himself to rehabilitation. He was originally housed in █████████████. During the eight weeks he was there, he formed a bible study group and regularly prayed with other inmates. He was subsequently transferred to Oklahoma City, then to Norther Neck, Virginia. Mr. Perkins has been incarcerated in Washington, D.C. since early-July. In each of these environments, Mr. Perkins has complied with all rules and regulations of each facility. He has proven he is a model inmate, and more importantly, that he can be easily supervised in the community. However, being away from his family has caused a tremendous amount of stress and he has lost 20 pounds since his incarceration on April 17, 2023. Additionally, Michael has struggled with the distress of transfers and the challenge of adjusting to a new institution, and has lived in fear of the violence he has seen between other inmates.

> d. *The need to provide adequate deterrence to criminal conduct and to protect the public from future crimes of the defendant.*

Michael Perkins is not at risk of committing another crime because the deterrent impact of this case has been overwhelming. He is a humble, family man who has wanted nothing more than to provide for his family and participate in his church. He is not an individual with extreme political views. Michael is ashamed and embarrassed by his conduct on January 6, 2021. He has

no intention of allowing himself to be involved with violence or unrest ever again.  His arrest, prosecution, trial, and incarceration thus far has sufficed to deter him from violating the law in any capacity in the future.

      *e.   The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

      This statutory objective simply does not apply to Mr. Perkins.  While he will take advantage of any learning opportunities available to him, he is already an accomplished skilled laborer.  Additionally, he has no need for medical care or other correctional treatments.

      *f.   The kinds of sentences available.*

      None of the counts of conviction carry mandatory sentences.  As such, there are no constraints on imposing a sentencing incorporating a downward variance.  The Court is required to exercise its broad discretion in assessing all of the 18 U.S.C. § 3553(a) factors to determine if a variant sentence is necessary to accomplish the goals of sentencing.  The parsimony clause requires a sentence that is sufficient but not greater than necessary to meet these statutory considerations.  All of the statutory factors mitigate in favor of a downward variance from the applicable Guidelines.

      The government asks this Court to impose a fine in the amount $13,004, the exact amount ███████████ has raised from individual citizens to aid the family in travel and lodging during the trial, and to assist with living expenses during Mr. Perkins' incarceration as Michael was the family breadwinner prior to his incarceration.  The defense submits that any fine is not appropriate.  As indicated in PSR ¶¶ 101-108, this is a family of modest means.  The joint family income in 2021 was $19,265, and in 2022 it was just $18,032.  PSR ¶ 108.  From the beginning of this case, Michael qualified for court-appointed counsel.  The government's request to seize the funds private citizens donated to help the family is inappropriate.  These funds were

not solicited by Ms. Perkins to further a political cause, but simply to support the family and as such, a fine is not appropriate.

g. *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*

The United States Probation Officer calculates Mr. Perkins' offense level in the instant case to be 28. Without further modification, and given Mr. Perkins' criminal history category of I, this would result in an advisory guideline range of 78 to 97 months' incarceration. Imposition of such a lengthy sentence fails to comply with 18 U.S.C. § 3553(a)(6). 18 U.S.C. § 3553(a)(6) states:

> The court, in determining the particular sentence to be imposed, shall consider… the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

This range, if imposed, would incarcerate Mr. Perkins for a longer period than any of the defendants included in this case comparison. Most, if not all, of the defendants in this comparison engaged in more aggravated conduct than Mr. Perkins on January 6, 2021. Nevertheless, under the proposed guidelines, Mr. Perkins would be given a longer sentence than any one of the defendants listed in Exhibit F. Mr. Perkins should not be sentenced to a longer period of incarceration than defendants who are members of right-wing militias or procured military grade equipment, defendants who actually breached the capitol building, and defendants whose conduct was notably more violent than that of Mr. Perkins.

Contrary to many of the defendants cited herein, Mr. Perkins was not a member of right-wing militia, such as the Proud Boys or Oath Keepers – organizations which promulgated violence and the overthrow of the election. And while Mr. Perkins is seen earlier in the day carrying a flag, he did not bring anything to Washington D.C. to use as a weapon. This presents a clear distinction with defendants such as Lucas Denney. Denney is the president of a Texas

based militia group and used that status on January 6 to encourage other members of his militia to attend the riot as well as equip himself and others with tactical gear and weapons.  Denney received a sentence of 52 months.  Another defendant, James Elliot, stated over text how proud he was of the promotion he received within the Proud Boys organization based on his conduct on January 6.  Elliot, like Mr. Perkins, struck officers on the head with a flagpole, yet was only sentenced to 37 months' incarceration.  Donald Hazard recruited individuals to join him at the riot and supplied himself and others with equipment such as "knuckle gloves," helmets, and ballistic vests.  Despite this, and the significant injuries suffered by an officer due to Mr. Hazard's conduct, he was sentenced to 57 months' incarceration.

While Mr. Perkins was on the Upper West Terrace of the Capitol building after the conduct for which he was convicted, he never entered or attempted to enter the building, unlike thousands of the rioters present that day.  Joshua Hernandez "paraded" through the Capitol for 40 minutes after climbing through a broken window.  Hernandez terrified congressional staffers inside, making it to within feet of employees seeking to hide themselves from what they believed to be impending violence.  Like Mr. Perkins, Hernandez struck an officer in the head with a flagpole.  The officer was further assaulted by the crowd after being disoriented due to this strike.  This is in sharp contrast to Officer Parker, who testified that he did not even realize he was struck by a flagpole until he was shown the body worn camera footage in slow motion.  Hernandez received a sentence of 24 months' incarceration.

After causing bodily injury to an officer with a flagpole, Gregory Nix breached the Capitol building with other rioters and spent 10 minutes inside the building.  Despite entering the building and injuring an officer with a flagpole, Nix was sentenced to 42 months of incarceration.  Similarly, Garrett Miller, despite being detained twice on January 6, made it as far

as the Old Senate Chamber before he was turned back by police. Miller assaulted no fewer than six officers on January 6. And he received a 38-month sentence.

Other examples of glaring disparities in sentence and conduct merit consideration when contemplating 18 U.S.C. § 3553(a)(6) in this case. Mark Leffingwell breached the building, encouraged rioters to push against the police line inside, and struck two officers with his fists. He was sentenced to just six months incarceration. David Judd acted as a leader and commander of rioters that day. He also assaulted officers and threw a firecracker at a line of police attempting to contain the riot. Judd received 32 months' incarceration. Alan Byerly used a stun gun against police officers and assaulted a reporter. He received a 34-month sentence. These sentences are significantly lower than the proposed guidelines in Mr. Perkins' case, and the 90-month sentence the government proposes, although they constitute a higher level of aggravation and violence than Mr. Perkins' conduct.

Because of the disparity between Mr. Perkins' conduct and the conduct of the defendants discussed here, a substantial downward variance is necessary to comply with 18 U.S.C. § 3553(a)(6). Unlike other defendants who participated in the riot that day, Mr. Perkins did not travel to Washington D.C. with the intent to engage with police. Mr. Perkins regrets his actions and has never bragged about his conduct on January 6 through social media or otherwise. He did not sign the shield Mr. Doolin stole that day. Most importantly, Mr. Perkins' conduct did not cause injury. He brought no weapons to the Capitol, he is not a member of any extremist political organizations, he did not induce anyone else to join him at the Capitol, he did not encourage other rioters to engage in violence against police, and he did not trespass inside the Capitol building. All these factors weigh in favor of granting Mr. Perkins a downward variance.

Despite the sentences discussed in Exhibit F, the government asks this Court to sentence Mr. Perkins to 90 months' incarceration.  For comparison, defendant Kyle Fitzsimmons was recently sentenced to 87 months' incarceration.  And his conduct was undoubtedly more intentional, violent, and more troubling than any facts of Mr. Perkins case.  Mr. Fitzsimmons was convicted of eleven counts, seven of which were felonies, after a bench trial before Judge Contreras.  The felonies include one count of violating 18 U.S.C. § 231(a)(3), two counts of violating 18 U.S.C. § 111(a)(1), and two counts of violating 18 U.S.C. § 111(a)(1) and (b) – four separate counts of aggravated assault.  The government describes his conduct as follows:

> Leading up to January 6, 2021, Fitzsimons knew that Congress planned to convene on January 6 to review and certify the Electoral College ballots, officially making Joe Biden the President-Elect, which Fitzsimons claimed would doom the country to a communist takeover.  He wanted to stop Congress's certification, was prepared to use force if necessary to do so, and tried to recruit others to join him.  On January 5, 2021, Fitzsimons traveled to Washington, D.C. from his home in Lebanon, Maine.  The next day, during the riot at the Capitol, Fitzsimons committed five separate violent assaults against police officers during the brawl at the mouth of the "tunnel" on the Lower West Terrace ("LWT").  In chronological order, he hurled a wooden staff like a spear at the group of officers, striking Metropolitan Police Department ("MPD") Officer Sarah Beaver in the head.  He swiped repeatedly at MPD Detective Phuson Nguyen's face, trying to strike him and dislodge his gas mask.  He wrenched USCP Sergeant Aquilino Gonell's shoulder so hard and for so long that he permanently damaged it, ending Sgt. Gonell's law enforcement career and forever inhibiting his ability to use it.  And Fitzsimons twice charged into the group of officers, wildly swinging his fists, indiscriminately trying to punch any officer he could reach.  Finally, after walking away from the "medieval battle" at the tunnel, Fitzsimons proudly celebrated his actions and urged other rioters to "get in there" and fight the police like he had.

> Even now—over two years after the Capitol riot and almost a year since being found guilty—Fitzsimons has demonstrated zero remorse for his conduct.  Indeed, he has given interviews from the D.C. jail insinuating that he is an innocent victim of a biased prosecution, and he has fundraised off his crimes.

*United States v. Kyle Fitsimmons*, 21-cr-158-01 (CR), ECF No. 116 at 2-3.

By contrast, Mr. Perkins did not go to Washington, D.C. with the intent to do anything but peacefully protest.  He did not attempt to recruit others or engage in separate aggravated

assaults.  He did not brag about his conduct immediately after or at any time since January 6, 2021.  Most importantly, Mr. Perkins' conduct did not result in injury, much less one which ended an officer's career.  To suggest Mr. Perkins should receive a sentence greater than the Kyle Fitzsimmons received flies in the face of 18 U.S.C. 3553(a)(6).

> h.  *The need to provide restitution to any victims of the offense.*

Mr. Perkins did not enter or attempt to enter the Capitol building.  However, he understand the government's request for this restitution and embraces the opportunity to make amends in this way.

## V.     <u>Conclusion.</u>

Careful consideration of all 18 U.S.C. § 3553(a) factors, not simply Mr. Perkins' conduct on January 6, 2021, supports a significant downward variance.  Mr. Perkins did not go to Washington, D.C. planning to engage in criminal conduct.  He brought no weapons, wore no tactical or combat gear, and did not incite or rally others to engage in this conduct.  Mr. Perkins immediately regretted his conduct and has never bragged or boasted about it.  He does not harbor extreme political views and has never been associated with an extremist group.  Mr. Perkins is a humble man of modest means who wants nothing more than to support his family and community, practice his religion and spread his faith to others who may benefit from it the way he has in his journey.   As such, a sentence incorporating a substantial downward variance is appropriate to individually sentence Mr. Perkins which is sufficient, but not greater than necessary, upon consideration of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted,


/s/ Nancy MacEoin
NANCY MacEOIN
Assistant Federal Defender

**CERTIFICATE OF SERVICE**


  I, Nancy MacEoin, Assistant Federal Defender, Federal Community Defender Office for

the Eastern District of Pennsylvania, hereby certify that I filed the attached Defense

Memorandum In Aid of Sentencing and Motion for Downward Variance, via the Court's

Electronic Filing (ECF) system which sent notification to Benet J. Kearney, Assistant United

States Attorney, One Saint Andrew's Place, New York, New York 10007, via her email address

Benet.Kearney@usdoj.gov.


          /s/ Nancy MacEoin
          NANCY MacEOIN
          Assistant Federal Defender


DATE:  August 8, 2023